No. 48,892

INTERNATIONAL VILLAGES, INC., OF AMERICA and SIMEDO ENTER-
PRISES, INC., and LEONARD M. SLATER and EVELYN V. SLATER,
*Appellants,* v. BOARD OF COUNTY COMMISSIONERS OF JEFFERSON
COUNTY, *et al.,* and PLANNING COMMISSION OF JEFFERSON COUNTY,
KANSAS, *et al., Appellees.*

(585 P.2d 999)

Opinion filed
October 28, 1978.

*Kenton C. Granger,* of Anderson, Granger, Nagels and Lastelic, Chartered, of
Overland Park, argued the cause and was on the brief for the appellants.

*Gary L. Nafziger,* County Attorney, argued the cause and was on the brief for
the appellees.

The opinion of the court was delivered by

McFARLAND, J.: This is an appeal from the judgment of the
district court affirming the denial by a regional planning com-
mission of appellants' applications for conditional use permits.

In its memorandum of decision the trial court made detailed
findings as to the exact nature of the desired use of the property.
These findings are not in dispute. The portion of the decision
relevant to this appeal is as follows:

"International Villages has options to purchase land from other plaintiffs for the
purpose of construction and operation of a recreational vehicle (called RV)
campground, for pull type house trailers, self-contained and otherwise, 5th wheel
trailers, motor homes, campers, pop-up tents, and the like.

"This land is zoned residential and agricultural. A conditional use permit is
required to operate the proposed facility. The Planning Commission, after hear-
ing, denied issuance of the conditional use permits and Plaintiffs appeal to this
court. Plaintiffs claim the action of the Planning Commission was unreasonable,
arbitrary, capricious and unlawful.

"Land on which this campground is proposed is bounded on three sides by land
owned by the Corps of Engineers of the United States Government in connection
with Perry Reservoir. International Villages seeks to operate under a franchise
from Jellystone, which is a national organization for this type of facility, and
which bears a good reputation, according to the evidence. International Villages

(called International) has financing capability of at least $2,500,000.00, and has sufficient financial ability to carry out its plans, if permitted to do so.

"The area involved consists of 120 acres, although some evidence shows possible expansion to 170 acres.

"The plan of International includes certain 'amenities' which are said to include a 'Ranger Station' which is a lounge type building, a country store, grocery store, swimming pool, miniature golf course, children's concessions, and certain 'comfort stations' which the court interprets to mean rest rooms, inasmuch as 'comfort stations' were not described with particularity.

"International proposes to create 1,000 camp sites on subject property, of an average dimension of 50 x 60 feet, of which 150 will be reserved for rental and 850 will be sold to individuals. Sale price for the lots will be $3,900.00, each. 25 acres will be reserved for the amenities area.

"Internal roadways and streets will be constructed, surfaced with gravel, except asphalt streets will be constructed in the amenities area. These will not be dedicated to the public.

"Water will be available in sufficient quantities from a Rural Water District. Electricity is available and sufficient.

"The sewers will be initially installed by International, and the proposal is for a non-overflow lagoon system, the initial concept of which has been approved by the State Board of Health. The proposal calls for 20% of the lots to be connected to the sewer line, 80% not connected.

"There will be four comfort stations; there will be one dump station in the central amenities area for dumping of wastes from self-contained RVs, and one dump station by each comfort station.

"International will retain ownership of the income producing amenities, and the 15% of the camp sites for rental, although these may be sold to a third party. Ownership of lots sold will vest in the respective purchasers; ownership of the streets, sewer system, electric system, water system, comfort stations and non-income producing amenities will be owned in common by the owners of the land. Management of the property owned in common (the streets, non-income producing amenities, water, sewer system, etc.) is proposed to be undertaken by a Home Owners Association plan which will have restrictions, although such a plan is not finalized.

"Security is said to consist of a guard at the entrance to the facility.

"Entrance to the facility will be from Jefferson County Road B.

"Surveys of International indicate there are 22,000 RV campers within one hour driving time of the proposed facility, and that the 850 lots for sale can be sold within 1½ to 2 years, sales to be on installment contracts for the most part.

"Surveys of International indicate the facility will contain 2,100 persons on peak days, 9,540 persons during peak weeks, and will be used 308,210 people days per year.

"At this time, there are 37 developments in the Perry Reservoir area; there are 9 Federal Public Use areas around the lake that have camping facilities, and there is one Kansas State park with camping facilities. There are over 100,000 persons in this area on peak week-ends. Access roads, Highways 92 and 16 between Tonganoxie and Ozawkie, are repeatedly clogged with boats, campers and RVs. One road, County Road B, serves the Slough Creek Area and the subject area. This road

is heavily traveled, and is very expensive to the County to maintain, is in bad condition, with chuck holes and deteriorating shoulders due to the volume of traffic it carries.

"By reason of the numbers of people now using this area, Jefferson County has had continual police and ambulance problems; by reason of recent regulations, the County has been required to take over all ambulances operating within the County, and the County now operates two ambulances. The expense for the Sheriff's department to the County has tripled. Expense for road maintenance has greatly increased. The County levies the maximum tax levy permitted by law, and in addition has received federal 'revenue sharing' to the extent of $120,000 to $140,000.00 per year, which may or may not continue. Without this 'revenue sharing' it is not possible for the County to maintain the necessary health, road maintenance, and police services now required for the present influx of persons, not including those sought to be brought in by plaintiffs. The resources of Jefferson County are now taxed, in all respects, to the limit.

"Services demanded and required for this influx of persons exceeds tax revenue generated by these developments and public use areas.

"Experience of and in Jefferson County with Home Owners Associations has been bad. This type of facility creates diverse ownership by transient people whose interest has been shown to be short-lived. Home Owners Associations operate with revenues contributed by the diverse owners who rarely participate. The history of such an Association type of management of a development in Jefferson County shows increasing problems with interior roadways and streets, sewers, water, and the maintenance thereof.

"Close to subject tract, there is a RV campground owned and operated by one Hendrix, who was granted a conditional use permit. However, the Hendrix facility is a camping facility only, and not at all similar to International's proposal. Hendrix's facility is much smaller, Hendrix owns all the land, owns all the electric and sewer facilities, owns the roadways and is personally responsible for maintenance. Hendrix is not permitted to sell lots; there is no diversity of ownership; there is no Home Owners Association.

"As correctly pointed out by plaintiffs, this is really a case involving denial of conditional use permits, and is not a zoning case. The Zoning Regulations do not permit a RV campground and the only way they can be permitted is through conditional use permit.

"Plaintiffs, in their brief, pose the controlling question thus:

'Is a commercial campground of the nature proposed by International Villages a project which sufficiently threatens the health, safety and welfare of the inhabitants of Jefferson County, Kansas, that it may properly be denied a conditional use permit?'

"Article 80.1 of the Zoning Regulations, CONDITIONAL USE PERMITS, PURPOSE, states:

'Certain kinds of uses need to be reasonably controlled by specific requirements that provide practical latitude for the investor but at the same time, maintain adequate provision for the security of the health, safety, convenience, prosperity or general welfare of the community's inhabitants. In order to accomplish such a dual objective, provision is made in these Regulations for a more detailed consideration of each conditionally permitted use as it relates to

location, design, size, *method of operation* and *intensity of land use* which in turn effects the *volume of traffic generated* and traffic movements, the *concentration of population* and the *kinds of public facilities and services it requires.* Land and structure uses possessing these particularly unique characteristics are permitted through the issuance of a Conditional Use Permit with conditions and safeguards attached as may be deemed necessary by the Planning Commission.' (Emphasis supplied.)

"Article 80.3, REVIEW BY PLANNING COMMISSION, recites, among other things:

'A. The Planning Commission shall review the *proposed development as presented* in the application in terms of these Zoning Regulations. . . .

'B. The Planning Commission shall find adequate evidence that *such use on the proposed location:*

 1. Will/will not be harmonious with the general objectives of the Master Plan.

 2. . . . .

 3. Will/will not be hazardous or disturbing to existing or future neighboring uses.

 4. Will/will not be detrimental to property in the immediate vicinity or to the community as a whole.

 . . . .' (Emphasis supplied.)

"In denying the application for change of zone and for conditional use permits, the Planning Commission considered the impact of International's proposal to the area financially, ecologically, the impact on county roads, the impact on county finances, the impact on the county government, and its experience with Home Owners Associations. Denial was couched in the following words:

 1. Would not be harmonious with the general objectives of the Master Plan.

 2. Could be hazardous or disturbing to existing and/or future neighboring uses.

 3. Could be detrimental to property in the immediate vicinity or to the community as a whole.

"It is seen the use of the word 'could' is in error. However, the evidence leads the Court to the conclusion that the Planning Commission's finding #1, 'Would not be harmonious with the general objectives of the Master Plan,' is amply supported by the evidence. The subject area is not included in 'recreational area' in the zoning map, master plan, although it is close by or adjacent.

"Plaintiff argues the Planning Commission or this Court should state under what conditions a conditional use permit will be issued to International; that it is unlawful to deny issuance of a conditional use permit outright; that nowhere in Article 80 is it stated that a conditional use permit may be flatly denied.

"A master plan is a guide to development. *Bodine v. City of Overland Park,* 198 Kan. 371. This, of necessity, includes the right to limit development, limit the impact on a rural community of unbearable concentrations of population in this type of facility and other facilities generated by the Perry Reservoir; this includes the right of a rural community to protect itself against ever increasing demands made in the name of recreation, demands on the people of Jefferson County, Kansas; demands for ever increasing police protection, health-ambulance services, ever-increasing tax loads generated in the name of recreation without generating equal tax revenues. Article 80.1 of the Zoning Regulations, above, recognizes these very same considerations when it speaks of 'method of opera-

tion,' 'intensity of land use,' 'volume of traffic generated,' 'concentration of population,' 'public facilities and services it requires.'

"Article 80.3 of the Zoning Regulations, above, states the Planning Commission reviews the 'proposed development as presented.'

"The Planning Commission has ample authority, if warranted by the evidence, to deny a conditional use permit. The Court is of the opinion that a conditional use permit may be 'flatly denied' if warranted by the evidence.

"Plaintiffs suggest the Planning Commission acted behind closed doors, in violation of the open meeting law. This is not supported by the evidence.

"The Court concludes plaintiffs have a right to appeal the decision of the Planning Commission to the District Court, and that plaintiffs have standing.

"The Court concludes from the evidence the action of the Planning Commission in denying change of zoning and in denial of the conditional use permits on the ground the same are not harmonious with the general objectives of the Master Plan was not arbitrary, capricious or arbitrary and was not unlawful. The decision of the Planning Commission is amply supported by competent evidence. . . ."

The ultimate issue in the case is whether the denial of the applications for conditional permits was unreasonable. The appeal to the district court was taken pursuant to K.S.A. 19-2926 which provides:

"Any and all acts and regulations provided for or authorized by this act shall be reasonable and any person having an interest in property affected may have the reasonableness of any such act or regulation determined by bringing an action against the county commissioners in the district court of the county."

The appellants attack the judgment on both substantive and procedural grounds. To understand the issues, it is necessary to recount the manner in which this action developed.

The first hearing before the Jefferson County Regional Planning Commission on the applications was held September 23, 1975. Prior to the meeting International supplied Gerald Rose, the Planning Director, with all the data he requested. After the completion of the agenda, the Planning Commission went into "executive session." At first, the permits were approved. Later on, during the same session, the approval was withdrawn and the applications were tabled for "further study and discussion of conditions to be attached for approval." In accordance with the practice of the Planning Commission, International was not present at the "executive session." Mr. Rose advised International by letter as to what had transpired and stated he would contact International prior to the next meeting to discuss "some of the proposed conditions which will be stipulated." No such contact was made. The second hearing was held on October 28, 1975. At

the close of this hearing, the Commission again went into "executive session" and rejected the applications. The grounds for the denial appear in the memorandum opinion of the district court.

On appeal International attacks the manner in which the Planning Commission arrived at its ultimate decision. It complains that although the Planning Commission consists of seven members, only three of the members were present at both meetings. There is no showing that the Commission lacked a quorum at either meeting, but, rather, that some members were present at one meeting that were not present at the other meeting. This point is without merit.

International next contends that the "executive sessions" violated the Open Public Meetings Act, K.S.A. 75-4317, *et seq.* Subsequent to the meetings herein, K.S.A. 75-4318 was amended to exclude bodies deliberating matters relating to a decision involving quasi-judicial functions. Zoning change applications were held to be quasi-judicial in nature in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978). There is some dispute as to whether International was excluded from attending the "executive sessions." Whether or not the "executive sessions" violated the Public Meetings Act does not void the actions taken and appellants raise the question only as evidence of "unreasonableness." The record has been reviewed and there is no showing the purpose of such sessions was to defeat or defraud International. The procedure of the Planning Commission was quite informal, but this does not vitiate its actions.

International contends that the Planning Commission did not have authority to issue flat denials of the applications. It contends it should have had an opportunity to comply with conditions or negotiate objected-to elements of the project. In support of this contention it cites Section 80.3 of the Jefferson County Zoning Regulations as follows:

> "C. The Planning Commission shall require as conditions of approval any other requirements, including guarantees that any conditions will be fulfilled, that it deems necessary to fulfill the intent of these Regulations."

Under this rationale, an application to establish a bawdy house could not be flatly denied. A planning commission may deny an application for a conditional use permit without stating any conditions for approval. If the applications for conditions are granted, then the approval may be *conditioned* on certain re-

quirements being complied with. An application may be denied *in toto.*

International next complains that the trial court considered evidence not before the Planning Commission.

The rules on reviewing evidence are summarized in *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1 (1975):

"On judicial review a court may receive evidence which was not presented to an administrative agency where such evidence is relevant to the limited issues before the court. However, a party appearing before an administrative body cannot produce his evidence piecemeal; *i.e.,* he cannot produce part of his evidence before the administrative agency—and then produce the balance on judicial review." (Syl. 7.)

This court further elaborated in that decision at 560:

"In *Rydd* [*v. State Board of Health,* 202 Kan. 721, 451 P.2d 239 (1969)] we said:
'. . . The trial in district court then is *de novo* in the sense the court may take its own evidence and is not necessarily limited to the evidence presented before the administrative board. The power to receive and consider such evidence, however, is not to be employed for the purpose of enlarging the scope of judicial review—the test being the evidence must be *relevant* to the limited issue before the court on appeal. . . . (202 Kan. at 732.)
This principle is subject to the important qualification that 'a party appearing before an administrative body cannot produce his evidence piecemeal. He cannot produce part of his evidence before an administrative agency and then produce the balance on judicial review.'(*Strader v. Kansas Public Employees Retirement System,* 206 Kan. 392, 402, 479 P.2d 860.)
"In *Keeney* [*v. City of Overland Park,* 203 Kan. 389, 454 P.2d 456 (1969)] we said:
'. . . Parties attacking the reasonableness of an ordinance should not be precluded from the presentation of relevant evidence showing unreasonableness, even though such evidence was not presented to the governing body. This is not meant to imply that the hearing in district court should be a retrial on the merits of the zoning application, irrespective of whether or not a record was made of the city council's proceedings; neither does it imply that a party may lie in wait and ambush the other side at the district court hearing. The district judge remains armed with his usual discretion in admitting or rejecting evidence, and his rulings will not be disturbed unless substantial rights of a party are thereby affected.' (203 Kan. at 394.)"

The trial court may take additional evidence that is relevant to the limited issues of reasonableness and legality of the order appealed from. *Keeney v. City of Overland Park,* 203 Kan. 389, 394, 454 P.2d 456 (1969); *Rickard v. Fundenberger,* 1 Kan. App. 2d 222, 563 P.2d 1069 (1977).

Much of the objected-to "new" evidence relates to testimony of

Planning Commission members as to what was considered by them in denying the applications. International, itself, presented evidence not before the Planning Commission. No abuse of discretion is shown in the admission of evidence.

This brings us to the ultimate issue of whether or not the denial of the applications for conditional use permits was unreasonable.

The trial court upheld the denials on the ground that there was ample evidence to support the Commission's conclusion that the project "[w]ould not be harmonious with the general objectives of the Master Plan."

From the findings of the trial court, which are supported by substantial competent evidence, the picture develops of a quiet county with a rather stable population which is suddenly "host" to thousands of transient pleasure seekers. This transformation arose by the creation of Lake Perry. County resources to handle such masses of humanity are stretched to the limit. The primary reason for the denial appears to be a concern about 850 landowners of temporary occupancy who own lots to be used for recreational purposes. Permanent structures and actual residency are not the purposes of ownership. Instead, the owners would use the lots as temporary locations for R.V. vehicles. Yet, these same lot owners are to be financially responsible for the maintenance of the streets, sewer system, water system, comfort stations, and other non-income producing amenities of the large project. The "Home Owners Association" is to collect sufficient sums from the 850 lot owners and International (for the unsold 150 lots) to maintain these public areas. Concern for the efficacy of such a system and the financial impact on the county if the system does not function is a legitimate concern. Under the totality of the circumstances, the denial of the applications was not unreasonable.

Other points raised are considered and found to be without merit.

The judgment is affirmed.